McCLAIN v UNIVERSITY OF MICHIGAN BOARD OF REGENTS

Docket No. 238782. Submitted March 11, 2003, at Detroit. Decided May 6, 2003, at 9:15 A.M. Leave to appeal sought.

Shawn McClain brought an action in the Court of Claims against the University of Michigan Board of Regents and the University of Michigan Medical Center, seeking damages for alleged medical malpractice that resulted in the miscarriage of the plaintiff's 17½-week-old fetus, which did not survive. The defendants sought summary disposition, asserting that the plaintiff could not recover for emotional distress, loss of consortium, or other damages arising from the loss of the nonviable fetus. The plaintiff argued that she was able to maintain a cause of action for her own emotional damages resulting from the medical malpractice that resulted in the miscarriage. The Court of Claims, Thomas L. Brown, J., granted summary disposition in favor of the defendants, holding that the plaintiff failed to state a valid cause of action with regard to the delivery of a nonviable fetus. The plaintiff appealed.

The Court of Appeals *held*:

1. A wrongful-death action cannot be brought on behalf of a nonviable fetus, because a nonviable fetus is not a "person" within the meaning of the wrongful-death act, MCL 600.2922(1). In addition, the plaintiff may not recover for loss of consortium for the loss of her unborn child.

2. The plaintiff's cause of action for damages in her own right as a result of her miscarriage is well-grounded. A miscarriage caused by another person's negligence, e.g., medical malpractice, constitutes an injury to the mother for which damages are recoverable in a tort action. The miscarriage of the fetus involved a physical impact on the plaintiff, legitimately encompassing her claim for the mental or emotional consequences. The loss of the pregnancy itself is a physical injury giving rise to damages. A recovery may be had where the proofs indicate the plaintiff experienced pain, suffering, and mental anguish, such as shame, mortification, mental pain and anxiety, annoyance, discomfiture, and humiliation. The Court of Claims erred in granting summary disposition in favor of the defendants.

Reversed and remanded.

Torts — Miscarriages — Actions — Wrongful Death — Nonviable
    Fetuses.
    A miscarriage caused by the negligence of another person constitutes
    an injury to the mother for which damages are recoverable in a tort
    action; a wrongful-death action may not be brought on behalf of
    the nonviable fetus following a miscarriage caused by such negli-
    gence; an action may not be brought by the mother seeking dam-
    ages for loss of consortium for the loss of her unborn child (MCL
    600.2922[1]).

*Worsham, Victor & Ahmad, P.C.* (by *Howard J. Victor* and *James S. Craig*), for the plaintiff.

*Kitch Drutchas Wagner DeNardis & Valitutti* (by *Christina A. Ginter, Beth A. Wittmann,* and *Mary Catherine Storen*) for the defendants.

Before: Griffin, P.J., and Neff and Gage, JJ.

Per Curiam. Plaintiff Shawn McClain appeals as of right an order granting summary disposition in favor of defendants University of Michigan Board of Regents and University of Michigan Medical Center pursuant to MCR 2.116(C)(8) and (C)(10).[1] We reverse and remand.

I

Plaintiff filed this medical-malpractice action in March 2001 following a miscarriage, which plaintiff alleged was caused by defendants' negligence. According to plaintiff, after a contact with her primary-care physician in July 1999 during her pregnancy, she was referred to the University of Michigan

---

[1] The Court of Claims did not indicate whether it was granting defendants' motion under MCR 2.116(C)(8) or (C)(10). Because the court considered documentary evidence, we review plaintiff's claims pursuant to MCR 2.116(C)(10). See *Verna's Tavern, Inc v Heite,* 243 Mich App 578, 584-585; 624 NW2d 738 (2000).

Medical Center's High Risk Clinic because of her history of a previous miscarriage. At the time, plaintiff worked as a hotel housekeeper and was concerned that her job could affect her pregnancy because she had experienced pain in the lower abdomen after engaging in physical tasks during work. The clinic physicians indicated that her employment would not affect her pregnancy, and she was given no work restrictions. Despite ultrasounds that showed that plaintiff had a shortened cervix and her history of a previous miscarriage, plaintiff was not offered a cerclage (stitching to hold the cervix closed) or a disability note. Although she was subsequently provided a temporary excuse from work, when she returned to work, she again experienced increased pain and bleeding. At that time, plaintiff was taken to a hospital by ambulance and on September 29, 1999, delivered a 17½-week-old fetus as a result of premature labor. The fetus did not survive.

Defendants filed a motion for summary disposition asserting that plaintiff was not entitled to recover for emotional distress, loss of consortium, or other damages arising from the loss of her nonviable fetus. In response, plaintiff asserted a claim for "bystander injuries," i.e., a cause of action occurring when a parent witnesses the negligent infliction of injury to her child and suffers emotional distress as a result. See, e.g., *Wargelin v Sisters of Mercy Health Corp*, 149 Mich App 75; 385 NW2d 732 (1986).[2] Plaintiff also

---

[2] Plaintiff argues on appeal that she is entitled to recover under a "bystander recovery" theory. See *Wargelin, supra.* However, as noted by defendants, plaintiff indicated during the hearing on defendants' motion that she was not, in fact, seeking recovery under a "bystander recovery" theory. Her affirmative waiver has caused this issue to be extinguished for

argued that she was able to maintain a cause of action for her own emotional distress resulting from the medical malpractice that resulted in the miscarriage. After hearing oral arguments and reviewing plaintiff's deposition testimony, the Court of Claims concluded that plaintiff had failed to state a valid cause of action with regard to delivery of a nonviable fetus.

II

The parties do not dispute that under Michigan law, an action for wrongful death, MCL 600.2922, cannot be brought on behalf of a nonviable fetus, because a nonviable fetus is not a "person" within the meaning of the wrongful-death act. MCL 600.2922(1); *Thomas v Stubbs*, 455 Mich 853; 564 NW2d 463 (1997); *McKinstry v Valley Obstetrics-Gynecology Clinic, PC*, 428 Mich 167, 192; 405 NW2d 88 (1987). "[T]he wrongful death act stands as the exclusive remedy for injuries resulting in death, MCL 600.2922(1) . . . ." *Endykiewicz v State Hwy Comm*, 414 Mich 377, 387; 324 NW2d 755 (1982).

In addition, plaintiff may not recover for loss of consortium for the loss of her unborn child. As noted in *Sizemore v Smock*, 430 Mich 283; 422 NW2d 666 (1988), "the common law of this state does not recognize a parent's action for loss of a child's society and companionship and that any decision to further extend a negligent tortfeasor's liability for consortium damages should be determined by the Legislature." *Id.* at 285. Moreover, although, under the wrongful-

---

appeal. *People v Carter*, 462 Mich 206, 214-216; 612 NW2d 144 (2000); *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 69; 642 NW2d 663 (2002).

death act, parents may recover for the loss of society and companionship of their child when the child dies as the result of negligent injury, *id.* at 296 n 24, this claim is inapplicable to the instant case for the reason outlined above.

However, plaintiff's cause of action for damages in her own right as a result of her miscarriage is well grounded in Michigan law, and summary disposition on the grounds argued by defendants was improper, i.e., that plaintiff had no physical injury from her loss of pregnancy and that her emotional injuries stemmed solely from her grief and sorrow, which is not compensable in a tort action.

A

More than a century ago, in *Tunnicliffe v Bay Cities Consolidated Railway* Co, 102 Mich 624; 61 NW 11 (1894), the Michigan Supreme Court recognized that a plaintiff who suffers a miscarriage as a result of another's negligence is entitled to compensation for her injury: " 'Any physical or mental suffering attending the miscarriage is a part of it, and a proper subject of compensation.' " *Id.* at 630, quoting *Bovee v Town of Danville*, 53 Vt 183 (1880). Recently, in *Carter v Hutzel Hosp*, unpublished opinion per curiam of the Court of Appeals, issued August 26, 1997 (Docket No. 195529), this Court reiterated that under Michigan law, a miscarriage caused by another person's negligence, e.g., medical malpractice, constitutes an injury to the mother for which recovery may be had in a tort action.

The *Carter* Court was not presented with, and did not address, the question whether an expectant

mother may recover for mental suffering allegedly caused by medical malpractice resulting in a miscarriage in the absence of physical injuries. In *Carter*, the plaintiff alleged that she suffered "bodily injuries." In this case, plaintiff's complaint alleged that she suffered the loss of the fetus and emotional damages, and incurred past, present, and future medical expenses and wage loss. After examining whether this distinction in circumstances warrants a difference in outcome in medical-malpractice claims, we find that it does not.

More than three decades ago, Michigan abolished the so-called "impact rule," which precluded recovery for injuries sustained by mental disturbance occasioned by the negligence of another where there was no immediate personal injury. *Daley v LaCroix*, 384 Mich 4, 11-12; 179 NW2d 390 (1970). Following a landmark 1888 case that sought recovery for much-disputed damage to a plaintiff's nervous system caused by a defendant's oncoming train, many American courts had adopted the impact rule, and its requirement for contemporaneous physical impact, as a hedge against "fraudulent or fancied" negligence claims and a feared flood of litigation. *Id.* at 9-10. Michigan joined with the majority by adopting the impact rule in 1899 and consistently cited its strictures thereafter. *Id.* at 11.

Over seventy years later, the *Daley* Court joined an increasing majority of courts in repudiating the impact rule. *Id.* at 12. Noting an onslaught of exceptions to the rule and the changed circumstances of factual and scientific information available, the *Daley* Court adopted the current rule allowing recovery for physical consequences produced as a result of emo-

tional distress proximately caused by another's negligence even in the absence of any physical impact on the plaintiff. *Id.* at 11-13. The Court noted that a majority of courts regarded the physical consequences of mental harm, or the circumstances of the accident, a sufficient guarantee of injury. *Id.* at 12. Hence, the oft-cited rule that a plaintiff may not recover emotional-distress damages without a showing of physical injury.

However, this rule must not be construed more broadly than intended. The geneses of the impact rule and the modern rule requiring objective physical consequences for emotional-distress recovery were situations in which a plaintiff sought recovery for mental disturbance caused by a defendant's negligence, but without accompanying physical injury or physical consequences, or any independent basis for tort liability. *Id.* at 8. As the *Daley* Court observed, *id.*, the law has always permitted recovery in closely analogous situations where the "plaintiff's mental or emotional reactions were a necessary element in the chain of causation." Further, "compensation for a purely mental component of damages where [a] defendant negligently inflicts an *immediate physical injury* has always been awarded as 'parasitic damages.' " *Id.*

Thus, recovery for emotional distress differs from recovery for mental anguish, and various specific nonpecuniary, personal damages beyond the ambit of emotional distress are available to a plaintiff who can establish proof of such damages. Patek, McLain, Granzotto & Stockmeyer, 1 Michigan Law of Damages and Other Remedies (ICLE), § 2.15, p 2-15 and § 2.17, p 2-16. These include: physical pain and suffering; mental anguish; fright and shock; denial of social

pleasure and enjoyment; embarrassment, humiliation, or mortification; or other appropriate damages. *Id.*; see also SJI2d 50.02 and comment.

B

In this case, defendants argued, and the Court of Claims agreed, that plaintiff's claim for "emotional damages" failed because she conceded in her deposition testimony that she had suffered no physical injuries:

> *Q.* Have you, as a result of the pregnancy loss, suffered any physical injuries?
> *A.* Physical, no.
> *Q.* Okay.
> *A.* Emotionally, yes.

We do not find plaintiff's response to defense counsel's inquiry dispositive of plaintiff's claim. This case is not properly analyzed in the context of an emotional-distress claim, i.e., where the alleged negligence results in a purely mental disturbance in the absence of any physical impact on the plaintiff.[3] *Daley, supra* at 12-13. Defendants' negligence is alleged to have resulted in the miscarriage. It would seem self-evident that the miscarriage of a 17½-week-old fetus involved a physical impact on plaintiff, legitimately encompassing her claim for the mental or emotional consequences. *Id.* at 8; cf. *id.* at 11 (fright, allegedly caused by a defendant's negligence, resulted

---

[3] As noted, plaintiff agreed at the hearing on the motion for summary disposition that she was not pursuing a bystander claim, in which recovery is sought for the infliction of emotional distress. See *Wargelin, supra* at 80-81.

in a miscarriage). That is, the loss of the pregnancy itself is the physical injury giving rise to damages. Thus, the policy concerns underlying emotional-distress claims are not implicated here. Whether plaintiff in fact suffered emotional harm as a result of the miscarriage is not questioned. Defendants' position on appeal is, as it was before the Court of Claims, that defendants do "not dispute that plaintiff experienced emotional distress at the loss of her fetus."

Moreover, counsel's phrasing of the deposition question concerning physical injury begged the answer. As noted, the miscarriage itself was a physical injury, and counsel's reference to it as a "pregnancy loss" does not alter the factual, physical injury.

While we agree with defendants' assertion that plaintiff's claim was not well-pleaded, we do not find this shortcoming fatal to her claim. Plaintiff alleged that she suffered "emotional damages." Emotional damages are not necessarily limited to "emotional distress," but may also encompass mental anguish. *Mieras v DeBona*, 204 Mich App 703, 710; 516 NW2d 154 (1994), rev'd on other grounds, 452 Mich 278; 550 NW2d 202 (1996); *Gore v Rains & Block*, 189 Mich App 729, 739-741; 473 NW2d 813 (1991). As noted, mental anguish differs from emotional distress and is properly compensated for in damages in a tort claim upon sufficient proof. *Mieras, supra; Gore, supra.*

C

Defendants, while acknowledging that plaintiff experienced emotional distress at the loss of her fetus, argue that plaintiff's deposition testimony establishes that she is seeking damages for grief and

sorrow over the loss of her nonviable fetus, noncompensable pursuant to the holding in *Tunnicliffe*. We disagree.

In allowing recovery of mental-suffering damages incident to a miscarriage caused by a defendant's negligence, the *Tunnicliffe* Court drew a line of demarcation between permissible damages naturally attending a miscarriage and impermissible damages for sorrow and grieving of the mother following the miscarriage, which are too remote to be considered:

> While the jury are allowed to consider the case with all its facts, and to take into account, for the purpose of compensation, not only the physical pain, but also mental suffering, in determining the award of damages, and while, of necessity, this involves to some extent a consideration of the nature of the injury, and cannot exclude from the consideration of the jury the fact that the physical and mental suffering of the mother by reason of such an injury would be more intense than in the case of the ordinary fracture of a limb, yet beyond this it would not be competent for the jury to go, and to attempt to compensate for the sorrow and grieving of the mother. [*Tunnicliffe, supra* at 629-630.]

A close review of the *Tunnicliffe* Court's basis and reasoning for this distinction raises clear questions of its continued viability. Quoting from the holdings and reasoning of other jurisdictions, the Court observed that if a plaintiff lamented the loss of her offspring, such grief involved an element of sentiment that would be inappropriately subject to the caprice and conjecture of the jury. *Id.* at 630. Further, if a mother wept for her children and would not be comforted, a question of continuing damage was presented, " 'too delicate to be weighed by any scales which the law has yet invented.' " *Id.*, quoting *Bovee, supra*. Finally,

the Court cited the reasoning of the Georgia courts, wherein the court stated, " '[t]he loss of a child by a miscarriage would affect women so differently that it would be hard for *men*, sitting as jurors, to estimate it as an element of damage,' " and it therefore would be better to omit from any instruction to the jury on the question of sorrow. *Id.* at 630-631, quoting *Augusta & S R R Co v Randall*, 85 Ga 297; 11 SE 706 (1890), which cited *Bovee, supra* (emphasis in *Augusta*).

It goes without saying that such reasoning is clearly no longer valid in today's world, and this Court would be reluctant to sanction any rule drawn from such outmoded bases. Citing *Bovee, supra*, as well as cases from other jurisdictions that have addressed this issue, the Maryland Court of Appeals recently noted that a number of decisions that have expressly denied recovery for grief related to a miscarriage, in effect, were denying solatium or loss-of-consortium damages, not recovery for distress over the unanticipated termination of the pregnancy or having had to endure a miscarriage or stillbirth. *Smith v Borello*, 370 Md 227, 244; 804 A2d 1151 (2002). Further, the Maryland court dismissed the notion that damages should be denied on the basis that they are too speculative, observing that juries are routinely charged with equally complex damages issues, such as infliction of emotional distress or sorting out multiparty, multicount contract suits. *Id.*

While it may be argued that the letter of the law requires continued adherence to the strictures of the *Tunnicliffe* Court's reasoning, we agree with the statement in *Carter, supra*, that *Tunnicliffe* indicates that the physical and emotional damages generally

available in negligence actions apply. Negligence cases in general have not been so limited over the course of time, and the modern-day rules permit recovery for pain, suffering, and mental anguish, such as shame, mortification, mental pain and anxiety, annoyance, discomfiture, and humiliation. Patek, § 2.17, pp 2-16 and 2-17; *Veselenak v Smith*, 414 Mich 567, 572-574; 327 NW2d 261 (1982). In any event, despite its qualification of available damages, *Tunnicliffe, supra* at 631, observes that pain and suffering give a wide latitude to juries and that there have been few complaints of inadequate compensation. We find this latitude adequate to compensate for the claimed injuries in plaintiff's case.

D

This Court reviews de novo a motion for summary disposition. *Ritchie-Gamester v City of Berkley*, 461 Mich 73, 76-77; 597 NW2d 517 (1999). When deciding a motion for summary disposition under MCR 2.116(C)(10), a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in the light most favorable to the nonmoving party. *Ritchie-Gamester, supra* at 76. When the burden of proof at trial would rest on the nonmoving party, the nonmovant may not rely on mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996).

Plaintiff testified during her deposition that she had isolated herself from her family and friends, had seen a psychiatrist four to five times, and that she suffered

from depression. Although discovery in this case was not yet complete, and the record is minimal, the record indicates that plaintiff was hospitalized and had to have a D & C[4] at the time of her miscarriage. Plaintiff also alleged that she incurred past, present, and future medical expenses and wage loss.

The summary-disposition standard requires that the evidence be viewed in a light most favorable to the nonmoving party. *Ritchie-Gamester, supra.* In light of our analysis, we conclude that plaintiff has presented sufficient evidence to withstand the motion for summary disposition.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

---

[4] Dilatation and curettage (D & C) is a gynecological procedure used to clean the uterus after a miscarriage. Plainsense, D and C, <http://www.plainsense.com/Health/Womens/dnc.htm>. "Dilatation is the dilating or opening of the cervix. This is done by inserting a series of metal rods of increasing diameter into the cervix until the opening is large enough to pass the curette (scraping tool) into the uterus. Another form of dilatation is to insert a laminaria plug (a seaweed rod) into the cervix. After six to 12 hours, the cervix will dilate sufficiently. The curette, which looks like a tiny spoon, is inserted into the uterus and it gently scrapes away at the uterine lining. The procedure takes about 20 minutes." *Id.*